# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

**ROBBIN LYNNE THOMPSON,**

> **Plaintiff,**

**vs.**                                   **CIVIL ACTION NO. 2:17-CV-01376**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

> **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered February 27, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 17 and 18.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 17.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 18.); **REVERSE** the final decision of the

Commissioner; and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings as explained *infra*.

**Procedural History**

The Plaintiff, Robbin Lynne Thompson (hereinafter referred to as "Claimant"), protectively filed her applications for Titles II and XVI benefits on March 14, 2013, alleging disability since October 27, 2011, because of "major depressive disorder, migraines, and carpal tunnel syndrome".[1] (Tr. at 243.) Her claims were initially denied on June 28, 2013 (Tr. at 64-81.) and again upon reconsideration on October 1, 2013. (Tr. at 86-107.) Thereafter, Claimant filed a written request for hearing on October 31, 2013. (Tr. at 132-133.) An administrative hearing was held on June 17, 2015[2] before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 42-63.) On September 9, 2015, the ALJ entered a decision finding Claimant had not been under a disability at any time from October 27, 2011 through the date of the decision. (Tr. at 14-35.) On November 5, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 12-13.) The ALJ's decision became the final decision of the Commissioner on November 2, 2016 when the Appeals Council denied Claimant's Request. (Tr. at 7-11.)

On February 24, 2017, after having received an extension of time from the Appeals Council (Tr. at 1-3.), Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.)

---

[1] In her Disability Report – Appeal, submitted on July 23, 2013, Claimant alleged that her depression, anxiety and "picking compulsion" were worse. (Tr. at 266.) In a subsequent Disability Report – Appeal, submitted on November 1, 2013, Claimant alleged that her depression, migraines and her carpal tunnel were worse. (Tr. at 303.)

[2] The hearing was initially scheduled for January 7, 2015, however, the matter was rescheduled in order for the ALJ to order a consultative mental status examination and psychological testing to determine the severity of Claimant's ability to function. (Tr. at 36-41.)

Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 17.), in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 18.), and Claimant filed her Reply. (Document No. 19.) Consequently, this matter is fully briefed and ready for resolution.

**<u>Claimant's Background</u>**

Claimant was 46 years old as of the alleged onset date, and considered a "younger person", but she later changed age categories to a "person closely approaching advanced age" as of the date of the ALJ's decision. <u>See</u> 20 C.F.R. §§ 404.1563(c) and (d), 416.963(c) and (d). (Tr. at 28.) Claimant obtained her GED, and later completed beauty school training. (Tr. at 244.) Claimant's past work activity included: prep cook; cashier; stock clerk; waitress; food manager; secretary or clerk; caregiver; and nail technician, ranging from medium to sedentary work. (Tr. at 59-60.)

**<u>Standard</u>**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. <u>See</u> <u>Blalock v. Richardson</u>, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. <u>Id</u>. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. <u>Id</u>. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. <u>Id</u>. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through September 30, 2015. (Tr. at 19, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of October 27, 2011. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: major depressive disorder; anxiety disorder; migraine headaches; and post-traumatic stress disorder (PTSD). (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(Tr. at 20, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity

("RFC") to perform a full range of work at all exertional levels but with the following

nonexertional limitations:

> she retains the capacity to understand, remember, and carry out simple, routine,
> repetitive tasks. She can respond appropriately to occasional superficial interaction
> with coworkers and supervisors in an environment free from teamwork, over-the-
> shoulder supervision, interaction with the general public, and fast pace production
> requirements. She would perform best in an environment with little or no decision
> making and where there are few, if any, changes in the work routine.

(Tr. at 22, Finding No. 5.) At step four, the ALJ found Claimant was unable to perform any past

relevant work. (Tr. at 28, Finding No. 6.) At the final step, the ALJ found that in addition to the

immateriality of the transferability of job skills, Claimant's age, education, work experience, and

RFC indicated that there were jobs that exist in significant numbers in the national economy that

Claimant could perform. (Tr. at 28-29, Finding Nos. 7-10.) Finally, the ALJ determined Claimant

had not been under a disability from October 27, 2011 through the date of the decision. (Tr. at 30,

Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant alleges two grounds in support of her appeal from the final decision. The first is

that the ALJ failed abide by the Regulations or by the Social Security Rulings with respect to her

credibility analysis because she based it entirely on the objective medical evidence. (Document

No. 17 at 10.) Claimant asserts that the ALJ's credibility determination indicates that she made

improper inferences from the absence of certain medical records, and further, selected only that

evidence that supported her determination that Claimant was not entirely credible. (Id. at 11-13.)

With respect to the second ground of alleged error, Claimant argues that the ALJ

discounted the medical opinion evidence, and then substituted her own judgment in lieu of the

competent medical opinion. (Id. at 13-14.) Claimant points out that the findings in the consultative psychological examination provided by DDS examiner Ernie Vecchio, M.A., as well as the opinions provided by two of Claimant's treating sources, psychiatric nurse practitioners at Prestera Center, were consistent with each other, as well as with Claimant's own testimony regarding her limitations, however, the ALJ gave those opinions no weight. (Id. at 14-16.) Because the ALJ rejected all the medical opinion evidence with respect to Claimant's mental impairments, the RFC assessment is not supported by substantial evidence. (Id. at 17.) Claimant asks this matter be remanded to correct these errors. (Id.)

In response, the Commissioner argues that Claimant's subjective complaints are not sufficient to render a finding that she is disabled, and further, the ALJ properly considered not only the objective medical evidence of record, but also Claimant's statements of disabling impairments and daily activities that resulted in a thorough credibility analysis that is supported by substantial evidence. (Document No. 18 at 3-7.) Moreover, the ALJ's credibility finding is entitled to deference absent extraordinary circumstances. (Id. at 5-6.) To the extent that Claimant argues that her subjective complaints were entitled to controlling weight, the Commissioner contends that other objective evidence is necessary to evaluate the intensity and persistence of her complaints, and further, the ALJ need not accept them where they are inconsistent with the available evidence. (Id. at 7.) In addition, to the extent that Claimant contests the ALJ's RFC finding, the Commissioner argues that such a determination rests with the ALJ alone, and that she was not required to rely on medical opinions to support her RFC assessment. (Id. at 7-8.) Any opinions with regard to Claimant's ability to work are not entitled to any special significance pursuant to the Regulations. (Id. at 8.) In sum, the medical evidence supported the ALJ's credibility

assessment, and Claimant's impairments were not totally disabling. (Id. at 9.)

With regard to the ALJ's evaluation of the opinion evidence, the Commissioner asserts that it was appropriate and that Claimant essentially asks the Court to reweigh this evidence. (Id. at 9-11.) The Commissioner points out that the ALJ was under no duty to assign any weight to the opinions of Claimant's nurse practitioners, as they were not acceptable medical sources under the Regulations, and the ALJ was entitled to consider that factor in weighing their opinions. (Id. at 11-12.) Furthermore, the Commissioner asserts that Claimant's argument that the RFC finding must be based on a medical opinion is wrong as a matter of law, such a proposition has since been superseded by 1991 regulatory changes, and further, this argument has already been rejected by the Fourth Circuit, as well as by this Court. (Id. at 12-14.) In addition, the ALJ provided an extensive explanation for not adopting Mr. Vecchio's opinion evidence, reconciled the conflicting evidence of record, and did not substitute her lay opinion in arriving at the RFC finding; she did not just give a conclusory statement rejecting the opinion. (Id. at 14-16.)

In sum, the Commissioner argues that Claimant failed to carry her burden of proof that she was disabled, that the final decision is supported by substantial evidence, and asks the Court to affirm the decision. (Id. at 16-17.)

In reply, Claimant states she does not argue that her subjective complaints alone would necessitate a finding of disability, and reasserts her position that the ALJ did not perform a proper credibility assessment, and did not provide the necessary explanation that supported her conclusions. (Document No. 19 at 1-2.) Claimant argues that the evidence shows that she is incapable of functioning at any RFC level required in an eight-hour workday on a continual basis. (Id. at 2.) Further, with respect to the ALJ's treatment of the opinion evidence, Claimant states she

is not asking the Court to reweigh the evidence and reminds the Court that the ALJ rescheduled the administrative hearing in order to obtain a psychological evaluation in order to determine Claimant's ability to function. (Id. at 2-3.) The ALJ misinterpreted Mr. Vecchio's findings contained in his report; if the ALJ found the report incomplete or inadequate, which is what happened here, then the Regulations provide that the ALJ was required to contact Mr. Vecchio to ask for the additional information. (Id. at 3-4.) Moreover, Claimant points out that some courts within the Fourth Circuit have found that an ALJ supplanted lay opinion in the absence of competent medical opinion evidence when assessing an RFC. (Id. at 4-5.) In short, Claimant argues remand is necessary because the ALJ failed to follow the proper legal standards. (Id. at 5-6.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Prestera Center Treatment Records:

The record indicates that Claimant had been receiving outpatient treatment at Prestera since October 2010.[5] (Tr. at 520-521.) From October 2010 through March 2013, Claimant had been under the care supervised by Gina Puzzuoli, M.D.; treatment notes indicated that Claimant's depression and PTSD symptoms "waxed and waned throughout the years." (Tr. at 24, 442-521.) Her GAF scores primarily ranged from 70-80 throughout this period, with 80[6] being most

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings, Claimant's mental impairments.

[5] During the "new client" psychiatric evaluation on May 10, 2013 with Lisa Kearns, APRN, there was indication that Claimant had been an outpatient at Prestera since 2005. (Tr. at 435.)

[6] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in schoolwork)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

prevalent. (Tr. at 443, 447, 451, 458, 466, 472, 474, 478, 476, 480, 482, 484, 486, 488, 490, 492, 494, 496, 498, 500, 502, 506, 508, 510, 512, 514, 516, 518, 520.)

By May 10, 2013, records indicate that Claimant initiated treatment under Lisa Kearns, APRN at Prestera. (Tr. at 422, 435-441.) Claimant reported that she last saw Dr. Puzzuoli on March 25, 2013 and that they were in the process of finding a new antidepressant that works for her. (Tr. at 435.) Claimant reported that her father, grandmother, dog of 12 years, and her best friend's infant baby died; she gave a history of staying in bed for six months in the recent past, though it was noted she had never been psychiatrically hospitalized. (Id.) She further reported that she just lost her medical card and reapplied "as plans on applying for Social Security Disability." (Tr. at 436.) Ms. Kearns observed Claimant's general appearance as being appropriate and well groomed, and she presented as cooperative, though guarded and defensive. (Tr. at 436-437.) Ms. Kearns adjusted Claimant's medications and assessed her GAF at 50.[7] (Tr. at 438-440.) Prestera records indicate that Claimant saw Ms. Kearns three more times, in August, October and November, 2013, and reported her depression and anxiety had worsened, and different medications were prescribed, including Seroquel and Risperdal. (Tr. at 426-434.) Claimant discontinued Seroquel on her own because of adverse side effects. (Tr. at 432.) She was "depending on the Social Security" and was denied, however, by November, her medical card was approved, and she was able to continue treatment with Parrish Harless the following month. (Tr. at 426, 430, 433.)

On December 12, 2013, Claimant followed up with Ms. Harless for her depression and anxiety. (Tr. at 522-526.) Claimant reported that she could not tolerate Risperdal and that both her

---

[7] A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." Id.

depression and anxiety had worsened; her mental status examination was otherwise normal. (Tr. at 522-523.) Ms. Harless prescribed Claimant Remeron for her sleep disturbances and increased her Pristiq dose. (Tr. at 525.) Ms. Harless assessed Claimant's GAF score at 50. (Tr. at 524.) By the next appointment in January 2014, Claimant reported doing "much better", and only complained of feeling tired around 4 p.m. (Tr. at 527.) Though Ms. Harless assessed Claimant's GAF score at 50 (Tr. at 529.), she continued Claimant's medications "as before." (Tr. at 530.)

Through May 2014, Claimant reported that she continued to do well, but felt her medications wore off about 4 p.m. and she would "just stop being bubbly and happy" and be depressed and worried. (Tr. at 536-539.) In June 2014, Claimant complained of feeling really overwhelmed, and that her depression increased; her mental status examination was overall normal. (Tr. at 541-542.) Ms. Harless opined that Claimant's "depressive symptoms are severe right now due to stress, but I believe the efficacy of her medication has stopped." (Tr. at 544.) Abilify and Pristiq were discontinued and Claimant began a trial of Viibryd instead. (Id.) By her next appointment in July 2014, Claimant reported "doing so much better" but was permitted to discontinue Viibryd because "it caused her to sleep almost a solid week" and resumed Pristiq. (Tr. at 546.) Ms. Harless noted that Claimant was "still struggling financially, but her medical issues are better." (Id.)

From May to July 2014, Ms. Harless consistently rated Claimant's GAF scores at 50. (Tr. at 534, 538, 543, 548.)

Records from August 2014 indicated Claimant had THC in her system and instructed to discontinue; she endorsed struggling with not using THC. (Tr. at 555, 558.) By October 2014, Claimant reported her anxiety was "really bad", and tested negative for THC, but positive for

Valium; she admitted overtaking her Klonopin and borrowing Valium from her mother. (Tr. at 560.) In November, Claimant continued to report worsening depression and anxiety since discontinuing Klonopin, and was warned that "any more violations of CS policy will result in permanent discontinuation of any CS drugs." (Tr. at 569.) By December 2014, Claimant reported being "much improved from her last appointment," she endorsed a good mood and improved anxiety symptoms. (Tr. at 576-577, 597-598.) The mental status exam was normal, and Ms. Harless assessed her GAF at 50. (Tr. at 577-579, 598-600.) Claimant's medications were continued, with Elavil being tried at bedtime for insomnia. (Tr. at 580, 601.) By March 2015, however, Claimant was "struggling with going", and she believed that she had "plateaued" and that her medications needed to be changed. (Tr. at 604-605.) Ms. Harless changed Claimant's medications and advised her to follow up in thirty days or as needed. (Tr. at 609.)

Charleston Area Medical Center:

In March and September 2012, Claimant twice presented to the urgent care center due to complaints of bad headaches. (Tr. at 362, 372, 388, 401, 405.) At the March presentment, medical providers requested an MRI of her head but denied by Medicaid due to no evidence of focal neurological changes, syncope, mental status changes, or a worsening of previously stable chronic headaches. (Tr. at 402-405.) In September 2012, when Claimant presented with severe headache, she also complained of chest pain with right and left arm numbness and tingling (Tr. at 388, 362, 391.), however, Claimant was transferred to the emergency room for further evaluation, as her chest and arm pain were thought to be associated with anxiety. (Tr. at 390.) Claimant's physical examinations at each visit were normal. (Tr. at 362, 372, 388, 401, 405.)

Family Counseling Connection:

Claimant treated with Sarah Jordan, M.A. from August 2012 through November 2012 for depression and self-harming behavior. (Tr. at 327-342.) When she presented in August, Claimant's chief complaint was depression and "picking her skin to draw blood." (Tr. at 327.) Her mental status was normal, though her mood was depressed. (Tr. at 328.) The treatment plan included weekly individual counseling. (Tr. at 329.) Claimant had six therapy sessions with Ms. Jordan and complained of increasing depression, anxiety, and panic attacks related to the wait in getting her records released to her new prescriber at Process Strategies for the continuation of her psychiatric care. (Tr. at 331, 333, 335, 337.) On September 18, 2012, Ms. Jordan noted Claimant had been to the ER twice in the past month due to panic/anxiety attacks and high blood pressure. (Tr. at 336.) A treatment note dated November 6, 2012 indicated that Ms. Jordan referred Claimant to a primary care provider to examine her skin because of her continued self-injurious behavior. (Tr. at 339.) By November 27, 2012, Claimant reported that her picking and scratching her skin had "been under control" over the prior weeks, however, she advised that a neurologist diagnosed her with carpal tunnel syndrome but he would not continue treatment until she was evaluated by a dermatologist for the lesions on her skin as a result of her picking and scratching. (Tr. at 341.) At Claimant's request, Ms. Jordan referred Claimant to attend DBT Skills Group with therapist Stephanie Knight. (Id.)

Neurology & Headaches Clinic PLLC:

Due to complaints of headaches and neck pain, Claimant presented to Darshan Dave, M.D. for a consultation in May 2012. (Tr. at 550, 552.) Her strength was normal in both upper and lower extremities, with no atrophy noted. (Tr. at 552.) An EMG/NCS was conducted, which revealed "mild median neuropathy at wrist No evidence [of] radiculopathy." (Tr. at 552, 553-554.) She was

assessed with migraine headache, carpal tunnel syndrome, neck pain, and paresthesias (tingling or numbness). (Tr. at 552.) Claimant returned to Dr. Dave for a follow up visit in November 2012, and reported that her carpal tunnel syndrome was no worse; it was noted "she has several symptoms she has headache chronic most symptoms are anxiety related." (Tr. at 551.)

Family Care Health Center:

On January 13, 2015, Claimant presented to the Family Care Health Center as a new patient and advised that she had not seen a doctor in a long time. (Tr. at 595.) She reported that she had recently changed her psychiatric medications and had some chest pain; she wanted to make sure it was the medications and not her heart. (Id.) Both the physical and psychiatric examination were normal; she reported no depression or sleep disturbances. (Id.) She was assessed with unspecified chest pain and fatigue, and blood tests were ordered. (Tr. at 596.)

**The Opinion Evidence**

State Agency Psychological Consultants:

On May 24, 2013, Barbara Lewis, Ph.D. reviewed the medical evidence of record at the initial level and determined that Claimant's mental impairments were not severe. (Tr. at 69-70, 78-79.) At the reconsideration level, on September 20, 2013, John Todd, Ph.D. affirmed Dr. Lewis's opinion. (Tr. at 93-94, 104-105.)

Disability Determination Evaluation from Nilima Bhirud, M.D.:

On June 12, 2013, Claimant was seen by Dr. Bhirud, DDS examiner. (Tr. at 414-419.) She reported a history of headaches that had started two years previously, and had been prescribed Imitrex, however, it did not agree with her, so she took Goody tablets for her migraine headaches. (Tr. at 414.) She also stated she has to go to a quiet dark place for her migraines. (Id.) Claimant

also reported that she was diagnosed with bilateral carpal tunnel syndrome for which Dr. Dave advised her to wear a right wrist split. (Tr. at 414-415.) She stated that the split seems to help. (Tr. at 415.) The physical examination was normal, though Dr. Bhirud noted "multiple excoriations on her arms, legs, and face." (Tr. at 415-416.) Dr. Bhirud's assessment included migraine headaches and multiple skin excoriations associated with Claimant's anxiety, as well as her given history of bilateral carpal tunnel syndrome. (Tr. at 416.)

State Agency Medical Consultants:

On June 28, 2013, at the initial level of review, Pedro Lo, M.D. reviewed the evidence and opined Claimant's physical impairments were not severe. (Tr. at 71-72, 80-81.) On September 19, 2013, upon reconsideration, Subhash Gajendragadkar, M.D. affirmed Dr. Lo's opinion. (Tr. at 94-95, 105-106.)

Medical Source Statement from Lisa Kearns, APRN:

On November 15, 2013, Ms. Kearns provided a statement regarding Claimant's mental ability to do work related activities. (Tr. at 422-425.) Ms. Kearns opined that Claimant's mental impairment and symptoms were "marked" and that her prognosis was "chronic – fair to poor." (Tr. at 422.) She assessed her GAF score at 50. (Id.) Ms. Kearns noted that Claimant had "mild" limitations with respect to her ability to understand, remember, and carry out simple instructions, and "mild" to "moderate" limitations with regard to her ability to make judgments on simple work related decisions. (Tr. at 423.) However, Ms. Kearns opined Claimant had "moderate" to "marked" limitations in her abilities in handling complex instructions as well as in her abilities to interact appropriate with the public, supervisors, and co-workers. (Id.) Ms. Kearns also found that Claimant had numerous signs and symptoms that were "extreme", including generalized persistent anxiety,

difficulty thinking or concentrating, psychomotor agitation or retardation, apprehensive expectation, motor tension, and recurrent and severe panic attacks. (Tr. at 423-424.) Ms. Kearns stated Claimant's "chronic anxiety, panic attacks and depression that significantly effect [*sic*] overall functioning." (Tr. at 425.) She believed Claimant was capable of managing benefits in her own best interests. (Id.)

### Medical Source Statement from Parrish Harless, APRN:

On December 5, 2014, Ms. Harless provided a mental assessment of Claimant's ability to do work related activities. (Tr. at 572-575.) Overall, Ms. Harless opined that Claimant had marked limitations in her ability to make occupational adjustments and "would have a hard time with work due to anxiety and depression." (Tr. at 573.) However, she had slight limitation in understanding, remembering and carrying out simple job instructions. (Id.) Ms. Harless further noted that Claimant had marked limitations in her abilities in making social adjustments and that "absenteeism would be an issue due to mood"; she believed Claimant was capable of managing benefits in her own best interests. (Tr. at 574.)

### Consultative Examination Report from Ernie Vecchio, M.A.:

On January 27, 2015, Mr. Vecchio conducted a consultative examination on behalf of the West Virginia Disability Determination Service. (Tr. at 583-593.) Claimant described herself as "basically a shut-in and I don't have a lot of trust in people." (Tr. at 584.) She indicated that she had been diagnosed with major depression ten years previously as well as PTSD due to abusive marriages. (Id.) Mr. Vecchio noted that Claimant was cooperative throughout his examination, and that she presented as "timid, meek, shaky, self-conscious, and depressed." (Tr. at 585.) The mental status examination was overall normal, though Mr. Vecchio noted Claimant's mood was depressed

and her affect apathetic; her insight poor; recent and remote memory were mildly deficient, concentration mildly deficient, but persistence and pace within normal limits. (Tr. at 585-586.)

Claimant achieved a valid full scale IQ of 75. (Tr. at 588.) Mr. Vecchio assessed Claimant with major depressive disorder, recurrent, severe without psychotic features and posttraumatic stress disorder. (<u>Id</u>.) He gave her a poor prognosis and opined that she was capable of managing her finances due to her math equivalency scores during testing. (Tr. at 589.)

Mr. Vecchio also provided a medical source statement of her mental ability to do work-related activities. (Tr. at 590-592.) He opined that Claimant had moderate restriction in her ability to understand, remember and carry out simple instructions; had marked restriction in her ability to make judgments on simple work-related decisions; and extreme restriction in her ability to understand, remember and carry out complex instructions as well as in her ability to make judgments on complex work-related decisions. (Tr. at 590.) Mr. Vecchio further opined that Claimant had marked restriction in interacting appropriately with the public or in responding to usual work situations and to changes in a routine work setting. (Tr. at 591.) He also found Claimant had extreme restriction in interacting appropriately with supervisors and co-workers. (<u>Id</u>.)

He based his assessments on Claimant's diagnoses of major depressive disorder and PTSD. (Tr. at 590, 591.)

## <u>The Administrative Hearing</u>

### <u>Claimant Testimony:</u>

Claimant testified that she had not worked since the date of her alleged onset of disability, October 27, 2011. (Tr. at 45.) She acknowledged that her disabilities included carpal tunnel syndrome, major depressive disorder, anxiety disorder, and migraine headaches. (<u>Id</u>.) She stated

that she had been unable to work since October 2011 because she was not very well, she had a lot of migraine headaches, and she could not seem to hold a job. (Tr. at 46.)

Claimant testified that she had migraine headaches two to three times per week, and, on average, the severity of her headache pain was an "8 to 10" on scale of 1 to 10, with 1 being the least amount of pain and 10 being the worst pain. (Id.) She stated that she had to go to bed to get rid of the migraines and "[u]sually the best way to do it is to tie something around my head to squeeze it very tight, and put pressure on it. I know that sounds strange." (Tr. at 46-47.) She stated that the migraines sometimes last several hours. (Tr. at 47.) Claimant stated that she had been prescribed Topamax for her headaches by her primary care doctor, and that she had seen a neurologist for the migraines in the past. (Id.) She stated that the Topamax did help in that it made her migraines milder in severity. (Tr. at 48-49.) Claimant testified that her everyday stress triggered migraines, such as not being able to pay her bills and the impending foreclosure of her home. (Tr. at 49.)

Claimant testified that she had carpal tunnel syndrome in both hands, and used a wristband on her right hand, which was the worse hand. (Tr. at 49-50.) She stated that her doctor had suggested surgery on her right hand, but she had been advised that she first needed to go to a dermatologist to get rid of scars on her arms that had occurred due to picking at her skin while nervous, and she had not gotten to the dermatologist yet. (Tr. at 50.) She stated that she had numbness in her fingertips and pain in her wrists when she picked up certain things, such as a gallon of milk. (Tr. at 51.) She stated that her hands also went numb and the index finger on her right hand was always numb. (Id.) She stated that she could lift five pounds comfortably, but she could lift a gallon of milk. (Id.)

Claimant testified that she had difficulty with depression and anxiety and that "everyday life is very hard", she stated it was very difficult to face not to be the person she once was or do what she once could do. (Tr. at 51-52.) She stated that she cried a lot and sat in her room and did not want to come out of it and she had to be forced to take showers. (Tr. at 52.) She stated that she lived with her son. (Id.)

Claimant stated that she took prescribed medication for her depression and anxiety, but she had not seen a counselor for about six months. (Id.) She stated that she saw her primary care doctor once per month. (Tr. at 53.) Claimant stated that her medications did seemed to help somewhat, noting that they kept her from stuttering and that she did not cry quite as bad. (Id.)

Claimant testified that she did not socialize, she has her mother, and talked with her on the telephone every day, but did not see her very often. (Tr. at 53-54.) She stated that she did not go out, except to the grocery store and then only if she could not get someone else to go for her. (Tr. at 54.) She testified, "It's a very big deal to do that," and "everything is heavy, everything is so big it's such a big job. It's a lot to do." (Id.)

Claimant stated that she had scars all over her body due to picking at her skin, but she had control of that although she could not remember when she stopped picking. (Id.) She stated that she had smoked marijuana and had last smoked two months prior to the hearing; she was never an "avid everyday user." (Tr. at 54-55.)

Claimant described a typical day as getting up to drink one cup of coffee and then going back to bed and sitting there. (Tr. at 55.) She stated that she did not have cable TV but she might sometimes watch a movie "that I've seen a thousand times before." (Id.) Her son had her coffee maker set up for her so she did not make her own coffee. (Id.) She stated that she usually stayed

in her pajamas all day. (Id.) She testified that she usually does not prepare meals for herself, that her son cooks for her, but acknowledged that she could make herself a sandwich. (Tr. at 56.) She stated that she needed motivation to eat, as well as reminders to take her medication. (Id.) She stated that she did not do housework and "everything is just behind"; she stated that the housework had fallen behind because of her depression. (Tr. at 56-57.) She stated that she felt overwhelmed and everything was hard to do. (Tr. at 57.)

Nancy Shapero, Vocational Expert ("VE") Testimony:

The VE stated that Claimant had "quite a list" of past work: prep cook, medium with an SVP of 2; cashier, light with an SVP of 3; stock clerk, medium with an SVP of 4; waitress, light with an SVP of 3; assistant food manager, light with an SVP of 5; secretary or clerk, light, with an SVP of 3; caregiver, medium with an SVP of 3; and nail technician/manicurist, sedentary with an SVP of 3. (Tr. at 59-60.) The VE testified that Claimant had obtained no transferable skills from her past jobs. (Tr. at 60.)

The ALJ asked the VE to assume an individual of the same age, education, and work history as Claimant, who was capable of performing work at all exertional levels, who retained the capacity to understand, remember, and carry out simple, routine, repetitive tasks, who could respond appropriately to occasional superficial interaction with coworkers and supervisors in an environment free from teamwork, over-the-counter supervision, interaction with the general public and fast-paced production requirements, who did best in an environment with little or no decision-making, and where there were few, in any, changes in the work routine. (Id.) The ALJ then asked the VE whether the above individual could perform any of Claimant's past work and the VE testified that the individual could not do so. (Id.)

The VE testified, however, that there were jobs that the hypothetical individual could perform and she cited three jobs in each exertional category from medium to sedentary as follows: medium exertional level – janitorial, stock clerk, and assembler; light exertional level – janitorial, price marker, and assembler; and sedentary exertional level – addresser, assembler, and electronics worker. (Tr. at 61.) The VE stated that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Id.)

The VE testified that if the individual was off task 15 to 20 percent of the time, then there would be no jobs she could perform. (Tr. at 62.) She stated that there would be no jobs available if the individual could just not generally complete an eight-hour day or if the individual missed at least four days of work per month. (Id.) The VE further testified that if the individual could not interact with coworkers, supervisors, or the general public, she would be precluded for all work activity and the same would be true if the individual could not respond to any type of change. (Id.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

The Credibility Assessment:

As previously stated, Claimant contends the ALJ's credibility analysis did not comply with the Regulations insofar as she relied entirely on the objective medical evidence to support her conclusions.

As an initial matter, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.") Nevertheless, Social Security Ruling (SSR) 96-7p[8] provides clarification for adjudicators when evaluating a claimant's symptoms, including pain; 20 C.F.R. §§ 404.1529 and 416.929 require a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. 1996 WL 374186, at *1.

---

[8] The undersigned is mindful that this Ruling has been superseded by SSR 16-3p, however, the previous Ruling was in effect at the time of the ALJ's decision, September 9, 2015.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work. Id. *passim*. In accordance with Sections 404.1529 and 416.929, the Ruling provides seven factors that an ALJ must consider in addition to the objective medical evidence when assessing a claimant's credibility:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Id., at *3.

With respect to Claimant's mental health issues, the ALJ determined that her allegations were disproportionate to the evidence, stating, "her mental health impairments appear somewhat controlled with medication management and mental health counseling from Prestera." (Tr. at 24.) The ALJ noted further that since her alleged onset date, the record had no evidence of "emergency room visits[9] or inpatient psychiatric hospital admissions for symptoms exacerbation." (Id.) After discussing Claimant's testimony as well as the medical records related to both her alleged physical and mental conditions, described *supra*, the ALJ ultimately found that Claimant's allegations were not entirely credible. (Tr. at 26.) The ALJ stated

> The claimant's conservative mental health treatment appears to control her symptoms adequately. She has pursued only limited care for physical health complaints and she receives only medication management of headaches. As to side effects of medication, there are none established that would interfere with the job identified below by the vocational expert. As to the claimant's activities of daily living, she has at times greatly minimized them but there is no basis for this in the record. Accordingly, the undersigned finds the claimant is capable of performing work within the limitations in the established residual functional capacity.

(Id.) The ALJ's credibility analysis was compliant with the Regulations and it is evident that she

---

[9] The undersigned notes that this particular finding is not entirely accurate, because the record indicates that Claimant presented to CAMC's Urgent Care Center on September 13, 2012 due to complaints of headache, chest pain and bilateral upper extremity tingling and numbness, however, she was transferred by Urgent Care personnel to the emergency department because her physical symptoms manifested from anxiety. (Tr. at 390.) Nevertheless, this single oversight does not demonstrate the ALJ's credibility assessment deviated from the pertinent legal authorities.

applied the factors promulgated under the pertinent Ruling. As a result, the ALJ's credibility determination is amenable to judicial review; accordingly, the undersigned **FINDS** substantial evidence supports the ALJ's credibility assessment.

Weighing the Opinion Evidence and Resulting RFC Assessment:

The next ground in support of Claimant's appeal concerns whether the ALJ committed error when she failed to give weight to the opinion evidence, and supplanted her own lay opinion. 20 C.F.R. §§ 404.1527 and 416.927 govern the SSA's criteria for evaluating opinion evidence; per §§ 404.1527(a)(2), 416.927(a)(2):

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Under §§ 404.1527(c)(1) and 416.927(c)(1), more weight is given to a physician who examines a claimant than to a non-examining physician.

Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

In this particular case, the ALJ weighed all the medical opinions concerning Claimant's mental impairments. Before addressing the opinion evidence, the ALJ properly performed the two-step process in substantiating Claimant's allegations about the intensity, persistence and functionally limiting effects of her pain and other symptoms against the objective medical evidence.[10] (Tr. at 23-26.) First, she gave "little weight" to the opinions of the two State agency consultants, as the ALJ noted they did not have the opportunity to consider subsequent evidence that indicated Claimant would be more limited. (Tr. at 26.)

Next, the ALJ afforded "no weight" to Ms. Kearns's opinion because the "number of marked and extreme limitations" were not supported by the clinical record or by Claimant's history of treatment. (Tr. at 26-27.) The ALJ noted that Claimant received only outpatient services and medication management of symptoms and that her activities of daily living were adequate, insofar as she alleged "[s]he can cook, drive, shop, manage finances, read, write, and maintain hygiene and grooming (Exhibits 2E, 5E, 8E, and Testimony)."[11] (Tr. at 27.) The ALJ also noted Ms. Kearns appeared to have treated Claimant on only two[12] occasions and not considered an acceptable medical source.[13] (Id.) The ALJ also gave Ms. Harless's opinion "no weight", reasoning that she

> assessed mostly marked limitations and provided no rationale for such severity of functioning. Her findings are inconsistent with other evidence including the most recent consultative examination, where she had poor insight but was otherwise noted with mild to normal findings on mental status examination (Exhibit 13F/3-4).[14] The undersigned notes that Ms. Harless' findings are inconsistent with her colleagues at Prestera, Ms. Kearns and Dr. Puzzuoli (Exhibit 6F).[15] In addition, Ms. Harless is not an acceptable medical source.

---

[10] Craig v. Chater, 76 F.3d 585 (4th Cir. 1996); 20 C.F.R. §§ 404.1529, 416.929.

[11] The ALJ cites the Exhibits pertaining to Claimant's Disability Report, dated March 22, 2013; the Function Report, dated May 6, 2013; and the Function Report dated August 5, 2013. (Tr. at 242-251, 258-265, 274-281.)

[12] The medical evidence of record, discussed *supra*, indicates that Claimant actually saw Ms. Kearns four times, including the initial "new patient" evaluation.

[13] See 20 C.F.R. §§ 404.1513(d), 416.913(d).

[14] Exhibit 6F concerns Mr. Vecchio's consultative examination report. (Tr. at 585-586.)

[15] (Tr. at 442-521.)

(<u>Id</u>.)

With regard to Mr. Vecchio's opinion on Claimant's limitations, the ALJ also gave it "no weight". (Tr. at 28.) Again, the ALJ found his "marked findings inconsistent with his own mental status examination findings. He assessed marked impairment in social interaction and responding to usual work situations or changes in routine but did not provide a rationale." (<u>Id</u>.) The ALJ contrasted this with "during mental status examination, [Claimant's] social functioning was only mildly deficient." (<u>Id</u>.) The ALJ gave the same explanation regarding Mr. Vecchio's finding Claimant had marked limitation in her ability to make simple work-related judgment "but again provided no rationale", and contrasted Claimant's mental status examination where it was noted she was "cooperative, oriented, and had concrete thought processes", normal judgment, and "memory, concentration, persistence, and pace were all in the mildly deficient to normal range." (<u>Id</u>.)

Finally, the ALJ addressed the GAF scores given during Claimant's mental health treatment, recognizing that they ranged from 50 to 80. (<u>Id</u>.) With respect to Dr. Puzzuoli's GAF assessments, the ALJ noted that Claimant was "functioning quite well", with the scores primarily ranging from 70-80. (<u>Id</u>.) The ALJ acknowledged that Dr. Puzzuoli "had an established treating relationship with the claimant and she appeared to offer GAF scores based upon functioning including the claimant's waxing and waning of symptoms." (<u>Id</u>.) The ALJ further recognized that Ms. Kearns and Ms. Harless offered "drastically different findings despite no apparent decrease in functioning or mental health crisis. Moreover, they did not appear to alter their GAF opinions despite fluctuations with improved and decline symptoms." (<u>Id</u>.) Ultimately, the ALJ found Dr. Puzzuoli's GAF opinions "more persuasive and deserving of greater consideration. As such, only

partial weight is afforded." (Id.)

It must be noted that the ALJ's written decision indicates that her explanations with regard to the opinions offered by Ms. Kearns and Ms. Harless sufficiently meet the Fourth Circuit standard for evaluating opinion evidence under Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986) and Hammond v. Heckler, 765 F.2d 424 (4th Cir. 1985). The ALJ stated "there is no indication in the record to support such a drastic drop in GAF scores" when Claimant started seeing Ms. Kearns after having been Dr. Puzzuoli's patient for over two years. The ALJ recognized that upon seeing Ms. Harless, despite improvements in her overall mental condition, Claimant's GAF scores remained at 50, "which appeared inconsistent with functioning." (Tr. at 25, 576-580.)

It is also important to recognize that the opinions provided by Ms. Kearns and Ms. Harless that concerned Claimant's limitations in functioning during an eight-hour workday are "residual functional capacity . . . or the application of vocational factors", which are issues solely reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Moreover, pursuant to Sections 404.1527(d)(3) and 416.1527(d)(3), the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Accordingly, the undersigned **FINDS** the ALJ's assessment of the opinion evidence provided by Ms. Kearns and Ms. Harless is appropriate under the pertinent legal standards and supported by substantial evidence.

However, the undersigned is mindful that the Claimant's primary argument does not really take issue with the ALJ's evaluation of the opinion evidence, but whether the her RFC assessment was the product of her own opinion, in the same vein as Grimmett v. Heckler, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974); McLain

v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983)). An RFC determination is based "on *all* the relevant evidence in [the] case record", which includes "relevant medical and other evidence" as well as "statements about what [the claimant] can still do", "descriptions and observations of [the claimant's] limitations . . . provided by [the claimant] . . . [.]" See 20 C.F.R. §§ 404.1545(a)(1), (a)(3), 416.945(a)(1), (a)(3) (emphasis added) The undersigned notes that a medical opinion is not necessary in formulating a claimant's RFC, however, the Regulations and controlling case law are clear that the Commissioner is obligated to consider "all" the evidence in the record. Colvard v. Chater, 59 F.3d 165 (4th Cir. 1995) ("The determination of a claimant's [RFC] lies with the ALJ, not a physician, and is based upon *all* relevant evidence.") (emphasis added)

Claimant's contention that the RFC assessment was developed in the absence of the psychological opinions in the record does not appear to be the case *entirely*: For starters, the ALJ noted Mr. Vecchio opined that Claimant "would have moderate limitations (defined as more than a light limitation but able to function satisfactorily) in her ability to understand, remember, and carry out simple instructions)" (Tr. at 27-28, 590.) The RFC provides that Claimant "retained the capacity to understand, remember, and carry out simple, routine, repetitive tasks." (Tr. at 22.) This specific RFC assessment has a basis in the psychological opinion evidence of record.

On the other hand, the RFC also provides that Claimant

can respond appropriately to occasional superficial interaction with coworkers and supervisors in an environment free from teamwork, over-the-shoulder supervision, interaction with the general public, and fast pace production requirements. She would perform best in an environment with little or no decision making and where there are few, if any changes in the work routine.

(Id.) These particular RFC restrictions appear to have no corresponding opinion from the psychological opinion evidence.

Though it remains the ALJ's discretion to afford no weight to Mr. Vecchio's opinion, there were at least three instances where the ALJ found Mr. Vecchio "did not elaborate", or that he "did not provide rationale" for his conclusions. (Tr. at 25, 28.) For instance, the ALJ noted Mr. Vecchio opined Claimant's "insight was poor though the examiner did not elaborate." (Tr. at 25.) The ALJ noted that Mr. Vecchio determined that Claimant "would have extreme limitation (defined as no useful ability to function) in her ability to . . . interact appropriately with supervisors and co-workers." (Tr. at 27.) The ALJ found that this limitation was provided without rationale. (Tr. at 28.) Finally, the ALJ noted that Mr. Vecchio found that Claimant had "marked limitation (defined as substantial loss in the ability to function effectively) in her ability to make judgments of simple work-related decisions, interact appropriately with the public, or respond appropriately to usual work situations or changes in a work routine setting." (Tr. at 27.) Again, the ALJ found that Mr. Vecchio provided no rationale for this limitation. (Tr. at 28.) Nevertheless, the ALJ crafted the particular RFC restrictions described *supra*.

To that extent, the undersigned agrees with Claimant that the ALJ rendered certain RFC restrictions in the absence of expert medical opinion and instead supplanted her own in the vein of Grimmett v. Heckler, 607 F.Supp. 502, 503 (S.D.W. Va. 1985). In addition, the undersigned agrees with Claimant that where an ALJ has discretion to order a consultative examination, which was exercised in this case, the Regulations provide that the ALJ "will contact the medical source who performed the consultative examination" in the event of an inadequate or incomplete report. See 20 C.F.R. §§ 404.1519p(b), 416.919p(b). Clearly, because the ALJ believed Mr. Vecchio provided no rational or explanation for some of his findings, which go to the heart of the contested items in the RFC assessment, the ALJ was required to take the necessary steps to ensure Mr. Vecchio

clarified his report. This is particularly important where the only reason for the continuance of the administrative hearing was to obtain a consultative psychological examination.

 In sum, the undersigned **FINDS** not only did the ALJ improperly evaluate the opinion evidence provided by Mr. Vecchio, but also crafted the resultant RFC restrictions explained *supra* in a psychological opinion vacuum. Accordingly, the undersigned **FINDS** the ALJ's findings and conclusions to these ends are not supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for remand to the extent that the ALJ correct the errors noted above (Document No. 17.), **DENY** the Defendant's request to affirm the final decision (Document No. 18.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner so that the ALJ can obtain a revised examination report from the psychological consultative examiner or arrange for another consultative examination as appropriate to properly determine Claimant's mental residual functional capacity.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is

made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: September 15, 2017.

Omar J. Aboulhosn
United States Magistrate Judge